Reference Agreement Number: 00914786
Adobe Contract Number: 00941422



# Adobe Sales Order

| | |
|---|---|
| **Customer** | OFFICE DEPOT, LLC |
| **Deal Registration ID** | DR3695067 |
| **Currency** | USD |

## Adobe Inc.

**Products and Services Pricing Detail:**

---

## Adobe On-demand Services

Except as otherwise specified in this Sales Order, these On-demand Services may be renewed for successive periods of 12 months upon mutual agreement of the Parties.

| Line Number | SKU | SKU Description | Billing Cycle | Quantity | License Metric/Unit of Measure | License Term Start Date | License Term End Date |
|---|---|---|---|---|---|---|---|
| 1 | 38059093 | JOURNEY OPTIMIZER:OD SINCH SMS RAN CODE | Quarterly in Advance | 1 | Each SMS CODE Per Year | 15-Oct-2023 | 24-Nov-2023 |
| 2 | 38059092 | JOURNEY OPTIMIZER:OD SINCH SMS US | Quarterly in Advance | 91.49 | Million SMS Messages Per Year | 15-Oct-2023 | 24-Nov-2023 |
| 3 | 38059093 | JOURNEY OPTIMIZER:OD SINCH SMS RAN CODE | Quarterly in Advance | 1 | Each SMS CODE Per Year | 25-Nov-2023 | 24-Nov-2024 |
| 4 | 38059092 | JOURNEY OPTIMIZER:OD SINCH SMS US | Quarterly in Advance | 94.86 | Million SMS Messages Per Year | 25-Nov-2023 | 24-Nov-2024 |
| 5 | 38059093 | JOURNEY OPTIMIZER:OD SINCH SMS RAN CODE | Quarterly in Advance | 1 | Each SMS CODE Per Year | 25-Nov-2024 | 24-Nov-2025 |
| 6 | 38059092 | JOURNEY OPTIMIZER:OD SINCH SMS US | Quarterly in Advance | 94.86 | Million SMS Messages Per Year | 25-Nov-2024 | 24-Nov-2025 |

| | |
|---|---|
| Adobe On-demand Services for the period of 15 October 2023 – 24 November 2023: | $61,160.22 |
| Adobe On-demand Services for the period of 25 November 2023 – 24 November 2024: | $564,370.38 |
| Adobe On-demand Services for the period of 25 November 2024 – 24 November 2025: | $564,370.38 |
| Adobe On-demand Services | $1,189,900.98 |

**1, 3, 5   JOURNEY OPTIMIZER:OD SINCH SMS RAN CODE**
"Leased short-code" means a set of digits (ie: 33768) used to enable Customer to send SMS marketing messages.

**2, 4, 6   JOURNEY OPTIMIZER:OD SINCH SMS US**
Customer is responsible for paying any Overages Fees incurred during the course of using the Sinch Products and Services licensed herein. These Overages Fees shall be billed at a rate of $5,783.00 USD per million SMS messages per year  and will be invoiced on a quarterly basis, payable pursuant to the terms of the Service Order. As used herein, "Overage Fees" mean the per message fee identified in the SKU for the Sinch Products and Services, where the fee is for messages sent in excess of the message amounts pre-purchased by Customer from Adobe.

Contract #: 6893

CONFIDENTIAL
08 August 2023 4:01:57 PM

**EXHIBIT 3**

CONFIDENTIAL

ADOBE_PIET_000027

## Summary of Fees

| | |
|---|---|
| **Sales Order Fees for the period of 15 October 2023 – 24 November 2023:** | $61,160.22 |
| **Sales Order Fees for the period of 25 November 2023 – 24 November 2024:** | $564,370.38 |
| **Sales Order Fees for the period of 25 November 2024 – 24 November 2025:** | $564,370.38 |
| **Total Sales Order Fees:** | $1,189,900.98 |

Contract #: 6893

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000028

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

## Sales Order Terms and Conditions

1.  This Sales Order is an amendment ("Amendment") to Adobe Contract Number 00914786 (the "Existing Agreement"). The products and services listed in the table on page 1 of this Sales Order above are provided under the terms with Sinch attached to this Sales Order as Exhibit A (collectively with this Sales Order, the "**Agreement**"). Customer acknowledges and agrees that it is entering into an agreement with Sinch as part of this Agreement, and that its contractual relationship with Sinch shall be governed by the terms of Exhibit A.

2.  This Sales Order is a co-termed pooled commitment to the Existing Agreement of 200 Million SMS messages to be used over the term of this Agreement with a Sinch blended rate of $5,783.00 (per million SMS messages per year).

3.  SLA Availability

    3.1  Pursuant to the Sinch Support terms referenced in Exhibit A, Sinch shall meet the Availability Target identified in these terms. For each month in which the Sinch product fails to meet this Availability Target, Adobe will provide to Customer a refund equal to the percentage set forth below of the Sinch related fees payable under the relevant Sales Order for the calendar month during which the failure occurred:

| Availability in a given calendar month for the Service(s) | | Service Credit (to be applied to charges for the Sinch Product) |
|---|---|---|
| From | To | % of the charges for the Sinch Product for same calendar month |
| 99.94% | 98.5% | 2% |
| 98.49% | 97.5% | 5% |
| 97.49% | 96.5% | 7% |
| 96.49% | 0% | 9% |

    3.2  For example, if the per message rate in a Sales Order is .005 per message, the availability was 99.75%, then the Service Credit will be .0001 per message  ((.005 * .02 (as the Service Credit percentage)).  In addition, if Sinch fails to meet any Availability Target during three continuous (3) calendar months in any rolling six -month period, it shall be deemed a material breach by Adobe of the Sales Order incapable of cure and Customer may terminate the Agreement upon written notice to Adobe.

    3.3  Notwithstanding anything to the contrary set forth in this Agreement, in no event shall the maximum cumulative Service Credit payable to Customer in any month exceed nine percent (9 %) of the total fees invoiced by Adobe under the Sales Order.

4   Except where prohibited by law, Adobe does not make or extend any warranties to the Customer related to Sinch products and services.  In cases where this disclaimer is prohibited by law, Adobe's total aggregate liability to the Customer shall not exceed ten-thousand dollars (US $10,000). Except as otherwise expressly stated herein, Adobe is not liable for claims related to Sinch products and services sold by Adobe under this Sales Order and any updates thereto.

5   Customer is responsible for paying any Overages Fees incurred during the course of using the Sinch Products and Services licensed herein.  These Overages Fees will be invoiced on a monthly basis and will be payable pursuant to the terms of the Service Order.  As used herein, "Overage Fees" mean the per message fee identified in the SKU for the Sinch Products and Services, where the fee is for messages sent in excess of the message amounts pre-purchased by Customer from Adobe.

6   Where Customer is more than sixty (60) days in arrears on its payment obligation to Adobe after written notice

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000029

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

of late payment to Customer, Adobe shall have the right to suspend Customer's use of the Sinch Products and Services either: (i) directly; or (ii) by notifying Sinch to suspend Customer from further use of the Sinch Products and Services, and upon such request, Sinch shall have the right to suspend Customer from future use of the Sinch Products and Services. Any such suspension shall remain in effect until Adobe provides written notice to Sinch to remove the suspension.

7    Customer acknowledges that to the extent Customer is purchasing Short-Codes, Vanity Codes (or transferring Short Codes, or Vanity Codes) it will take 4-6 weeks from the date a campaign brief form is submitted to a carrier(s) to provision such Short Code, Vanity Code, and during this period the SMS Service will be inaccessible.

8    Customer agrees to purchase the Products and Services set out in the Products and Services Pricing Detail section. The fees outlined herein may only be changed upon mutual written agreement of the parties. The offer described in this Sales Order is contingent upon Customer's execution and return of this Sales Order no later than 15 August 2023 (unless countersigned by Adobe).

9    All fees will be invoiced beginning on the applicable Start Date in accordance with the Billing Cycle, as noted in the Products and Services Pricing Detail section. Payment terms are net 60 days and will be measured from the date of invoice.

10   Purchase Order ("PO") required? Yes → tick: ☐            If a PO is required by Customer, it must be delivered to Adobe on the Effective Date of the Sales Order, or promptly thereafter. If the PO is not received by Adobe on the Effective Date of the Sales Order, or promptly thereafter, or is not required by Customer, then the Adobe Contract Number and/or the Deal Registration Number will be referenced on the Adobe invoice. Payment due date(s) will not be extended by any delays in issuing a PO.

**Page 4 of 65**

CONFIDENTIAL                                                ADOBE_PIET_000030

By signing below, each Party acknowledges that it has carefully read, fully understands, and agrees to the terms of this Agreement. This Agreement becomes effective upon the date of last signature (the **"Effective Date"**). Each of the individuals signing this Agreement represents that they have the authority to bind their respective Party to its terms.

**Adobe Inc. (ADUS)**
345 Park Avenue, San Jose CA 95110, United States

| | |
|---|---|
| Anthony Miller | |
| **Authorized Signature** | |

Anthony Miller
**Print Name**

Manager, Order Management
**Title**

Aug 9, 2023
**Date**

**OFFICE DEPOT, LLC**
6600 NORTH MILITARY TRAIL,
BOCA RATON, FL  33496-2434 UNITED STATES

DocuSigned by:
Kevin Moffitt
1291EBF75A8D444...
**Authorized Signature**

*Kevin Moffitt*
**Print Name**

*EVP, Chief Retail Officer*
**Title**

8/10/2023
**Date**

Purchase Order Number   :
ECC ID Number:  0001431634

DS
ODP
LEGAL
EAB

CONFIDENTIAL
08 August 2023 4:01:57 PM

DocuSign Envelope ID: 4134994B-E81A-4581-A45F-C399E80478A5

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

## Instructions for Signed Agreements

**North America**

| End User: 1431634 | Bill-To: 0001447140 | Ship-To: 1431634 |
|---|---|---|
| OFFICE DEPOT, LLC<br>6600 NORTH MILITARY TRAIL<br>BOCA RATON, FL, 33496-2434<br>UNITED STATES | OFFICE DEPOT, LLC<br>PO BOX 982211<br>EL PASO, TX, 79998-2211<br>UNITED STATES | OFFICE DEPOT, LLC<br>6600 NORTH MILITARY TRAIL<br>BOCA RATON, FL, 33496-2434<br>UNITED STATES |
| | Invoicing Contact Name:<br>Contact Email:<br>office.depot@conduent.com<br>Chris.Dargis@officedepot.com | Customer Admin Name: Ranjith Chalasani<br>Contact Email:<br>ranjith.chalasani@officedepot.com |

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000032

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

**Exhibit A**
**Sinch America Inc. Terms and Conditions**

The Sinch Products and Services listed in this Sales Order shall be made available to Customer by Sinch America Inc. ("Sinch") subject to, and conditioned upon, Customer's agreement to the terms set forth in this Section concerning Sinch Products and Services, including, without limitation, the Sinch Terms (as defined below). As used herein, the "Sinch Products and Services" means those products and services designated as being provided by Sinch in the Adobe On-demand Services table in this Sales Order.

1        Customer Acknowledgement of and Agreement to Sinch Terms. Customer acknowledges and agrees to the following terms, conditions, and contractual relationship with Sinch with respect to Customer's Use of the Sinch Products and Services, where "Use" means Customer's initiation of an SMS message for transmission by the Sinch network and platform via Customer's presence on the Adobe Journey Optimizer platform:

- Data Protection Agreement: https://www.sinch.com/data-protection-agreement/ (the "Sinch DPA"), and attached hereto as Attachment A.
- Messaging Supplemental Terms and Conditions: https://www.sinch.com/messaging-supplemental-terms-and-conditions/ (the "Sinch Messaging Supplemental Terms"), and attached hereto as Attachment B.
- General Terms and Conditions: https://www.sinch.com/general-terms-and-conditions/ (the "Sinch GTC"), and attached hereto as Attachment C.
- Support terms - https://www.sinch.com/messaging-service-level-agreement-sla/ (the "Sinch Support Terms" and, together with the Sinch GTC, the Sinch Messaging Supplemental Terms and the Sinch DPA, the "Sinch Terms"), attached hereto as Attachment D.

The individual documents making up the Sinch Terms are listed above in their order of precedence with respect to the interpretation and construction of the Sinch Terms and any perceived conflict between or among specific terms.

2        By its execution of this Sales Order, Customer agrees that: (i) it is entering into the Sinch Terms directly with Sinch, and thereby an enforceable agreement with Sinch; (ii) Sinch shall have the right to directly enforce the Sinch Terms against Customer in all respects; and (iii) Customer hereby waives any and all defenses or objections it has or it might have to the enforcement by Sinch of the Sinch Terms against it, including, without limitation, any objection to the absence of Sinch's signature to this Sales Order.

3        Service Level Agreements with respect to Sinch Products and Services.
3.1      Sinch shall meet the SLA Availability terms as provided herein, and Adobe, where Customer is entitled to a credit pursuant to such terms , shall provide to Customer the credits identified herein.

4        HIPAA and Sinch.  Sinch Products and Services sold hereunder shall not be used to send Personal Health Information (PHI) as defined under the Health Insurance Portability and Accountability Act of 1996 (and any amendments thereto), and such use is not a permitted use under the Sinch Terms.

5        Sinch and EU Citizen Data.  Sinch Products and Services sold hereunder shall not be used to send messages to (or offer goods and services to) EU citizens, unless specifically provided for herein.

6        Sinch as a Third-Party Beneficiary.  Each of Adobe and Customer acknowledges and agrees that Sinch is an intended third-party beneficiary of this Sales Order with respect to the Sinch Terms hereunder for the purpose, and with the right of full enforcement, of the Sinch Terms as if Sinch was a signatory to this Sales Order.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL                                                                                   ADOBE_PIET_000033

7       Responsibility of Sinch with respect to Adobe Products and Services. Except where prohibited by law, the Customer hereby disclaims all claims of liability against Sinch America Inc. and its affiliates related to the Adobe products and services sold by Adobe under this Sales Order or otherwise and any updates thereto. Further, neither Sinch nor any of its affiliates makes or extends any warranties to the Customer related to any Adobe products and services. In cases where this disclaimer is prohibited by law, Sinch's (including its affiliates') total aggregate liability to the Customer shall not exceed ten thousand dollars (US$10,000).

8       Customer's Use Territory: Customer represents and warrants that it is a company or other legal entity located in the United States or Canada and that its use of the Sinch Products and Services will be limited to within the United States or Canada in all respect.

9       Sinch will maintain cybersecurity insurance with respect to the Service during term of the Order. Upon customer's request Sinch will provide to customer a certificate of insurance reflecting such insurance.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000034

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

## ATTACHMENT A

# DATA PROCESSING AGREEMENT

Version 6 - Date of release: 7 July 2023

This Data Processing Agreement (this "**DPA**") forms part of Sinch master services agreement (the "**Principal Agreement**") between Sinch and the Customer and is subject to the Principal Agreement. **Definitions.** For the purposes of this DPA, capitalized terms shall have the following meanings. Capitalized terms not otherwise defined shall have the meaning given to them in the Principal Agreement.

   (a) **"Customer's Personal Data"** means any personal data that is processed by Sinch on behalf of the Customer to perform the Services under the Principal Agreement.

   (b) **"Applicable Data Protection Laws"** means the GDPR, as transposed into domestic legislation of each Member State (and the United Kingdom) and as amended, replaced or superseded from time to time, and laws implementing, replacing or supplementing the GDPR and all laws applicable to the collection, storage, processing, and use of Customer's Personal Data, including the California Consumer Privacy Act of 2018, Cal. Civ. Code § 1798.100 et seq ("**CCPA**").

   (c) **"GDPR"** means the General Data Protection Regulation (EU) 2016/679 on the protection of natural persons with regard to the processing of personal data and the free movement of such data.

   (d) **"Sinch Infrastructure"** means (i) Sinch's physical facilities; (ii) hosted cloud infrastructure; (iii) Sinch's corporate network and the non-public internal network, software, and hardware necessary to provide the Services and which is controlled by Sinch; in each case to the extent used to provide the Services.

   (e) **"Restricted Transfer"** means a transfer of the Customer's Personal Data from Sinch to a sub-processor where such transfer would be prohibited by Applicable Data Protection Laws (or by the terms of data transfer agreements put in place to address the data transfer

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000035

DocuSign Envelope ID: 413499AB-581A-4591-A15F-C399F60478A5

restrictions of Applicable Data Protection Laws) in the absence of appropriate safeguards required for such transfers under Applicable Data Protection Laws.

(f) **"Services"** means the services provided to the Customer by Sinch pursuant to the Principal Agreement.

(g) **"Standard Contractual Clauses"** means the latest version of the standard contractual clauses for the transfer of personal data to processors established in third countries under the GDPR (the current version as at the date of this DPA is as annexed to European Commission Decision 2021/914 (EU) of June 4, 2021).

(h) **"UK Addendum"** means the United Kingdom Addendum (International Data Transfer Addendum to the EU Commission Standard Contractual Clauses) set out at https://ico.org.uk/media/for-organisations/documents/4019539/international-data-transfer-addendum.pdf

(i) The terms **"consent"**, **"controller"**, **"data subject"**, **"Member State"**, **"personal data"**, **"personal data breach"**, **"processor"**, **"sub processor"**, **"processing"**, **"supervisory authority"** and **"third party"** shall have the meanings ascribed to them in article 4 of the GDPR or the CCPA, in cases where CCPA is applicable.

## 2. Compliance with Applicable Data Protection Laws

(a) Sinch and the Customer shall each comply with the provisions and obligations imposed on them by the Applicable Data Protection Laws and shall procure that their employees and sub-processors observe the provisions of the Applicable Data Protection Laws

## 3. Details and Scope of the Processing

(a) The Processing of the Customer's Personal Data within the scope of the Agreement shall be carried out in accordance with the following stipulations and as required under Article 28(3) of the GDPR. The parties may amend this information from time to time, as the parties may reasonably consider necessary to meet those requirements.

(i) **Subject matter and duration of the processing of personal data:** The subject matter and duration of the processing of the personal data are set out in the Principal Agreement.

CONFIDENTIAL
08 August 2023 4:01:57 PM

(ii) **The nature and purpose of the processing of personal data:** Under the Principal Agreement, Sinch provides certain services such as messaging, email, voice calls and other communication services, as further detailed in the Principal Agreement, to the Customer which involves the processing of personal data. Subject to section 3(a)(iv), such processing activities include (a) providing the Services; (b) the detection, prevention and resolution of security and technical issues; and (c) responding to Customer's support requests.

(iii) **The types of personal data to be processed:** The personal data submitted to Sinch's network, the extent of which is determined and controlled by the Controller in its sole discretion, may include name, email, telephone numbers, IP address and other personal data included in the contact lists and message or call content.

(iv) **Independent Data Controller Exclusion**:  Notwithstanding any other provision herein, when processing personal data in the course of providing communication services as part of the Services, including the transmission and exchange of SMS via telecommunications networks and other messages and communications, including emails, voice, and other media via other communication platforms, regardless of whether Customer acts as a controller or processor, Sinch acts as an independent data controller, and not as joint controller, so as to provide its communications services and carry out its necessary functions and business as a communication services provider, including necessary measures to prevent spam and fraud and control, security, and maintenance of its network, management of its business and compliance functions, and consistent with its obligations under applicable laws.

(v) **The categories of data subjects to whom the personal data relates:** Senders and recipients of email and sms messages, voice calls or other communication.

(b) Sinch shall only process the Customer's Personal Data (i) for the purposes of fulfilling its obligations under the Principal Agreement and (ii) in accordance with the documented instructions described in this DPA or as otherwise instructed by the Customer from time to time. Such Customer's instructions shall be documented in the applicable order, services description, support ticket, other written communication or as directed by Customer using the Services (such as through an API or control panel).

(c) Where Sinch reasonably believes that a Customer instruction is contrary to the provisions of the Principal Agreement or this DPA, or that it infringes the GDPR or other

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

DocuSign Envelope ID: 413499AB-581A-4581-A15F-C399F60478A5

applicable data protection provisions, it shall inform the Customer without delay. In both cases, Sinch shall be authorized to defer the performance of the relevant instruction until it has been amended by Customer or is mutually agreed by both Customer and Sinch.

(d) Customer is solely responsible for its utilization and management of personal data submitted or transmitted by the Services, including: (i) verifying recipient's information such as phone number or address and that they are correctly entered into the Services (ii) reasonably notifying any recipient of the insecure nature of email or messaging as a means of transmitting personal data (as applicable), (iii) reasonably limiting the amount or type of information disclosed through the Services (iv) encrypting any personal data transmitted through the Services where appropriate or required by applicable law (such as through the use of encrypted attachments, PGP toolsets, or S/MIME). When the Customer decides not to configure mandatory encryption, the Customer acknowledges that the Services may include the transmission of unencrypted email in plain text over the public internet and open networks. Information uploaded to the Services, including message content, is stored in an encrypted format when processed by the Sinch Infrastructure.

(e) Deviations.

(i) For Customers and contracts in Brazil, the obligations set forth in Section 13(b)-13(c) will not be applicable, and the following definitions shall replace the ones used:

"Special Categories of Personal Data" shall mean Sensitive personal data: this means such data concerning racial or ethnic origin, religious beliefs, political opinions, membership to a trade union or religious, philosophical or political organizations, data concerning health or a natural person's sex life, genetic or biometric data, when related to a natural person."

"Data Processing" shall mean any operation carried out with personal data, such as those that refer to the collection, production, receipt, classification, use, access, reproduction, transmission, distribution, processing, filing, storage, elimination, information evaluation or control, modification, communication, transfer, diffusion or extraction.

(ii) For Customers and contracts in Colombia, in addition to what is agreed upon in this DPA, the following is applicable concerning the processing and transfer of personal data:

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000038

DocuSign Envelope ID: 413499AB-581A-4581-A15F-C399E60478A5

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

"Controller acknowledges that Processor may transfer, store, and process Personal Data to territories outside of Colombia, where it will be subject to the laws of the foreign jurisdictions in which it is held. Controller acknowledges that it possesses all necessary consents and legal authority from data subjects and registrations of databases that would allow Processor to process the data within databases and in countries that meet at least the same data protection standards (adequate level of protection) as the ones provided under Colombian laws (such as, but not limited to, Decree N° 90 of 2018, the Unique Circular from the Superintendence of Industry and Commerce and the External Circular N° 005 of 2017 from the Superintendence of Industry and Commerce)."

(iii) For Customers and contracts in Argentina, in addition to what is agreed upon in this DPA, the Parties agree to conclude the following Argentinian Standard Contractual Clauses for international transfer in case the Controller of the personal data is from Argentina and/or applicable Data Protection Legislation and/or the Argentinian Data Protection Authority require these clauses to be concluded:

Contrato modelo de transferencia internacional de datos personales con motivo de prestación de servicios

Entre, por una parte, _____, con domicilio en la calle_____, localidad_____, provincia de _____, Argentina, (en adelante, "el exportador de datos") y, por la otra, _____ (nombre), _____ (dirección y país), ("en adelante, el importador de datos"), en conjunto "las partes", convienen el presente contrato de transferencia internacional de datos personales para la prestación de servicios, sometiéndola a los términos y condiciones que se detallan a continuación.

Contrato modelo de transferencia internacional de datos personales con motivo de prestación de servicios

(iv) For Customers and contracts in Mexico, the obligations set forth in Section 13(b)-13(c) will not be applicable.

## 4. Controller and Processor

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000039

DocuSign Envelope ID: 413499AB-581A-4591-A15F-C399F60478A5

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

(a) For the purposes of this DPA, the Customer is the controller of the Customer's Personal Data and Sinch is the processor of such data, except when the Customer acts as a processor of the Customer's Personal Data, in which case Sinch is a sub-processor.

(b) Sinch shall at all times have in place an officer who is responsible for assisting the Customer (i) in responding to inquiries concerning the Data Processing received from Data Subjects; and, (ii) in completing all legal information and disclosure requirements which apply and are associated with the Data Processing. Such assistance may be requested at privacy@mailgun.com for Sinch Email and dpo@sinch.com for other Sinch services.

(c) The Customer warrants that:

(i) The processing of the Customer's Personal Data is based on legal grounds for processing, as may be required by Applicable Data Protection Laws and that it has made and shall maintain throughout the term of the Principal Agreement all necessary rights, permissions, registrations and consents in accordance with and as required by Applicable Data Protection Laws with respect to Sinch's processing of the Customer's Personal Data under this DPA and the Principal Agreement;

(ii) it is entitled to and has all necessary rights, permissions and consents to transfer the Customer's Personal Data to Sinch and otherwise permit Sinch to process the Customer's Personal Data on its behalf, so that Sinch may lawfully use, process and transfer the Customer's Personal Data in order to carry out the Services and perform Sinch's other rights and obligations under this DPA and the Principal Agreement;

(iii) it will inform its Data Subjects about its use of Processors in Processing their personal data, to the extent required under Applicable Data Protection Laws; and,

(iv) it will respond in a reasonable time and to the extent reasonably practicable to enquiries by Data Subjects regarding the Processing of their personal data, and to give appropriate instructions to Sinch in a timely manner.

## 5. Confidentiality

(a) Sinch shall ensure that each of its, and sub-processors', personnel that is authorized to process the Customer's Personal Data is subject to confidentiality undertakings or

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000040

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

professional or statutory obligations of confidentiality and are trained with the relevant security and Data Protection requirements.

## 6. Technical and Organizational Measures

(a) Sinch shall, in relation to the Customer's Personal Data, (a) take and document reasonable and appropriate measures, as described in Annex 2, in relation to the security of the Sinch Infrastructure and the platforms used to provide the Services as described in the Principal Agreement, and (b) on reasonable request at the Customer's cost, assist the Customer in ensuring compliance with the Customer's obligations pursuant to Article 32 of the GDPR.

(b) Sinch's internal operating procedures shall comply with the specific requirements of an effective Data Protection management.

## 7. Data Subject Requests

(a) Sinch provides specific tools in order to assist customers in replying to requests received from data subjects. These include our APIs and interfaces to search event data, suppressions, and retrieve message content. When Sinch receives a complaint, inquiry or request (including requests made by data subjects to exercise their rights pursuant to Applicable Data Protection Laws) related to the Customer's Personal Data directly from data subjects Sinch will notify the Customer. Taking into account the nature of the processing, Sinch shall assist the Customer, by appropriate technical and organizational measures, insofar as this is reasonably possible, for the fulfillment of the Customer's obligation to respond to requests for exercising such data subjects' rights.

## 8. Personal Data Breaches

(a) Sinch shall notify the Customer without undue delay once Sinch becomes aware of a personal data breach affecting the Customer's Personal Data. Sinch shall, taking into account the nature of the processing and the information available to Sinch, use commercially reasonable efforts to provide the Customer with sufficient information to allow the Customer at the Customer's cost, to meet any obligations to report or inform regulatory authorities, data subjects and other entities of such personal data breach to the extent required under Applicable Data Protection Laws.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

## 9. Data Protection Impact Assessments

(a) Sinch shall, taking into account the nature of the processing and the information available, provide reasonable assistance to the Customer at the Customer's cost, with any data protection impact assessments and prior consultations with supervisory authorities or other competent regulatory authorities as required for the Customer to fulfill its obligations under Applicable Data Protection Laws.

## 10. Audits

(a) Sinch shall make available to the Customer on reasonable request, information that is reasonably necessary to demonstrate compliance with this DPA.

(b) Customer, or a mandated third party auditor, may upon written reasonable request conduct an inspection in relation to the Processing of the Customer's Personal Data by Sinch and to the extent necessary according to Data Protections Laws and without interrupting Sinch's business operations and ensuring confidentiality.

(c) The audit right as described in Paragraph 10(b) above will become applicable for the Customer, in case Sinch has not provided sufficient evidence of its compliance with the provisions of this DPA. Sufficient evidence includes providing either: (i) a certification as to compliance with ISO 27001or other standards implemented by Sinch (scope as defined in the certificate); or (ii) an audit or attestation report of an independent third party. An audit as described within this Paragraph 10 shall be carried out at the Customer's cost and expense.

## 11. Return or Destruction of the Customer's Personal Data

(a) The Customer may, by written notice to Sinch no later than at the time of termination of the Principal Agreement, request the return and/or certificate of deletion of all copies of the Customer's Personal Data in the control or possession of Sinch and sub-processors. Sinch shall provide a copy of the Customer's Data in a form that can be read and processed further.

(b) Within ninety (90) days following termination of the account, Sinch shall delete all personal data processed pursuant to this DPA, unless Customer requests the return of personal data as described in Paragraph 11(a) above. This provision shall not affect potential

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000042

DocuSign Envelope ID: 413499AB-581A-4581-A15E-C399F60478A5

statutory duties of the Parties to preserve records for retention periods set by law, statute or contract.

(c) Any additional cost arising in connection with the return of personal data after the termination or expiration of the Agreement shall be borne by the Customer.

## 12. Data Transfers

(a) The Standard Contractual Clauses and, if required, the UK Addendum, having Sinch act as data importer with the Customer acting as data exporter are incorporated as part of this DPA. If Sinch's arrangement with a sub-processor involves a Restricted Transfer, Sinch shall ensure that the onward transfer provisions of the Standard Contractual Clauses and/or UK Addendum are incorporated into the Principal Agreement, or otherwise entered into between Sinch and the sub-processor. The Customer agrees to exercise its audit right in the Standard Contractual Clauses by instructing Sinch to conduct the audit set out in Paragraph 10.

(b) Customer acknowledges and agrees that, in connection with the performance of the Services under the Agreement, Sinch may transfer personal data within its company group. These transfers are necessary to provide the Services globally.

(c) For transfers of personal data from the European Union, the European Economic Area and/or their member states, Switzerland and the United Kingdom to countries which do not ensure an adequate level of Data Protection within the meaning of Data Protection Laws of the foregoing territories, to the extent such transfers are subject to Data Protection Laws and Regulations and in order to implement appropriate safeguards, the following safeguards are taken: (i) Standard Contractual Clauses as per European Commission's Decision 2021/914/EU of June 4, 2021, (2) UK Addendum, and (3) additional safeguards with respect to security measures including data encryption, data aggregation, separation of access controls and data minimization principles.

## 13. Sub-processing

(a) The Customer hereby gives a general authorization to Sinch to appoint sub-processors in accordance with this Paragraph 13 and Annex 1. Sinch will ensure that sub-processors are bound by written agreements that require them to provide at least the level of data protection required of Sinch by this DPA. The Customer also gives Sinch a specific authorization to

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

DocuSign Envelope ID: 413499AB-581A-451A-A15F-C399F60478A5

continue to use those sub-processors already engaged at the date of this DPA, as referenced in section (b).

(b) The current sub-processors for the Services are set out at https://www.sinch.com/data-protection-agreement/sub-processors/ ("**Sub-processor List**"). **Provided that the Customer subscribes to notifications of new sub-processors through the subscription mechanism found at https://www.sinch.com/data-protection-agreement/sub-processors/,** Sinch shall notify the Customer, through such mechanism, thirty (30) days' in advance of any intended changes concerning the addition or replacement of any Sub-processor. If, within ten (10) business days of receipt of that notice, the Customer notifies Sinch in writing of any objections on reasonable grounds to the proposed appointment, Sinch shall not appoint that proposed sub-processor until reasonable steps have been taken to address the objections raised by the Customer and the Customer has been provided with a reasonable written explanation of the steps taken. If Sinch and the Customer are not able to resolve the appointment of a sub-processor within a reasonable period, either party shall have the right to terminate the Principal Agreement for cause.

(c) Sinch shall be responsible for the acts and omissions of any sub-processors as it is to the Customer for its own acts and omissions in relation to the matters provided in this DPA.

## 14. Governing law and jurisdiction

(a) The parties to this DPA hereby submit to the choice of jurisdiction stipulated in the Principal Agreement with respect to any disputes or claims howsoever arising under this DPA, including disputes regarding its existence, validity or termination or the consequences of its nullity.

(b) This DPA and all non-contractual or other obligations arising out of or in connection with it are governed by the laws of the country or territory stipulated for this purpose in the Principal Agreement.

(c) Notwithstanding the forementioned under this Paragraph (a) and (b), all obligations arising out of or in connection with the Standard Contractual Clauses incorporated into this DPA shall be governed by the laws of the EU Member State specified in Annex 1, as required for the validity of those Standard Contractual Clauses pursuant to European Commission's Decision 2021/914/EU of June 4, 2021.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000044

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

## 15. Order of precedence

(a) With regard to the subject matter of this DPA, in the event of inconsistencies between the provisions of this DPA and any other agreements between the parties, including the Principal Agreement and including (except where explicitly agreed otherwise in writing, signed on behalf of the parties) agreements entered into or purported to be entered into after the date of this DPA, the provisions of this DPA shall prevail.

## 16. Severance

(a) Should any provision of this DPA be invalid or unenforceable, then the remainder of this DPA shall remain valid and in force. The invalid or unenforceable provision shall be either (i) amended as necessary to ensure its validity and enforceability, while preserving the parties' intentions as closely as possible or, if this is not possible, (ii) construed in a manner as if the invalid or unenforceable part had never been contained therein.

## 17. Termination

(a) With the termination of the Principal Agreement, this DPA and the Standard Contractual Clauses will terminate upon the fulfillment of Sinch's obligation to delete the personal data under processing in accordance with Paragraph 11.

(b) Any amendment or variation to this DPA shall not be binding on the Parties unless set out in writing and signed by authorised representatives of each of the Parties.

\* \* \*

IN WITNESS WHEREOF, this DPA and the Annexes are entered into and becomes a binding part of the Principal Agreement with effect from the date first set out above.

## ANNEX 1

## STANDARD CONTRACTUAL CLAUSES

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

With regard to the Standard Contractual Clauses the Parties agree that:

(a) Module 2 (Controller-to-Processor) will apply where Sinch acts as Customer's data processor; Module 3 (Processor-to-Processor) will apply where Sinch acts as Customer sub-processor. For each Module, where applicable:

(b) Clause 7 (Docking clause) is incorporated;

(c) For the purposes of Clause 9.a) (Use of sub-processors), Option 2: General written authorization shall apply. The data importer has the data exporter's general authorization for the engagement of sub-processors from an agreed list. The data importer shall specifically inform the data exporter in writing of any intended changes to that list through the addition or replacement of sub-processors at least thirty (30) days in advance;

(d) The optional wording in Clause 11 (Redress) on independent resolution bodies is not incorporated;

(e) For the purpose of Clause 13 (Supervision), IMY, the Swedish Data Protection Authority (Integritetsskyddsmyndigheten)  shall act as competent supervisory authority;

(f) Option 1 of Clause 17 (Governing law) shall apply and the laws of Sweden shall govern the Standard Contractual Clauses;

(g) For the purposes of Clause 18 (Choice of forum and jurisdiction), the courts of Sweden will resolve any dispute arising out of the Standard Contractual Clauses;

(h) Annex IA (List of Parties) and Annex IB (Description of Transfer) shall be completed using the information and details specified in the Principal Agreement and listed in Paragraph 3 of the DPA;

(i) Annex IB (Description of Transfer) shall be further completed by specifying that no sensitive data shall be transferred. The frequency of the transfer shall be continuous. For transfers to sub- processors, the subject matter, nature and duration of the processing shall be the same as that of the data importer;

(j) For the purpose of Annex IC, the competent supervisory authority in accordance with Clause 13 is IMY, the Swedish Data Protection Authority (Integritetsskyddsmyndigheten);

CONFIDENTIAL
08 August 2023 4:01:57 PM

(k) For the purpose of Annex II, the Technical and organisational measures are described in Annex 2 of the DPA;

(l) For the purpose of Annex III, the List of Sub processors is included in Annex 3 of the DPA.

(m) where the Restricted Transfer is subject to the Regulation as it forms part of the law of England and Wales, Scotland and Northern Ireland (UK GDPR), the Standard Contractual Clauses shall incorporate the UK Addendum completed as follows:

(i) For the purposes of Table 1, the start date is the date of the DPA's signature and the Parties' details shall be completed using the information and details specified in the Principal Agreement;

(ii) For the purposes of Table 2, the version of the Approved EU SCCs which the UK Addendum is appended to is the Standard Contractual Clauses as completed in accordance with this Annex 1, with the date being the effective date of this Addendum;

(iii) For the purposes of Table 3, the Appendix Information is as described in paragraphs (h) - (l) of this Annex 1; and,

(iv) For the purposes of Table 4, the Sinch entity acting as the Importer may end the UK Addendum when the Approved Addendum changes.

## ANNEX 2

## INFORMATION SECURITY - TECHNICAL AND ORGANIZATIONAL MEASURES

The Technical and Organizational Measures included within this Annex are measures that are applicable on the Service(s) provided by Sinch. If necessary, for the Service, Sinch may include further Technical and Organizational measures in the Service Order or Service

### 1) Inventory of information and other associated assets

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

An inventory of information and other associated assets, including owners, is developed and maintained. An asset owner has been appointed for every asset within the inventory according to the asset tagging policy.

## 2) Authentication information

The allocation and management of authentication information is controlled by a management process, which includes advising personnel on the appropriate handling of authentication information.

In particular, Sinch:

- Do not limit the permitted characters that can be used.

- Password minimum 16 characters

- Do not use secret questions as a sole password reset requirement

- Require email verification of a password change request

- Require the current password in addition to the new password during password change

- Verify newly created passwords against common passwords lists or leaked passwords databases

- Check existing user passwords for compromise regularly

- Memorized secrets must be salted and hashed using a suitable one-way key derivation function.

- Enforce appropriate account lockout and brute-force protection on account access max 5 failed logins, then lock for 30 mins

- The last 24 passwords must not be re-used

- 365 day password change

- Guest network passwords if low risk can be set to never expire if following the password length requirement (min 16 characters)

- MFA & SSO used in all use cases

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000048

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

## 3) Access rights

Access rights to information and other associated assets is provisioned, reviewed, modified and removed in accordance with the organization's topic-specific policy on and rules for access control.

In particular in Sinch:

- Access rights are reviewed quarterly.
- User accounts inactive for over 90 days are disabled
- Quarterly access reviews should be performed for all offices access systems to check that users access rights are still valid.

## 4) ICT readiness for business continuity

ICT readiness is planned, implemented, maintained and tested based on business continuity objectives and ICT continuity requirements.

In particular, in Sinch:

- All Business Units have one or more Disaster Recovery Plans specifically aligned with the product offering.
- The DRP is tested annually through using Incident Simulation.

## 5) Information security awareness, education and training

Personnel of the organization and relevant interested parties receive appropriate information security awareness, education and training and regular updates of the organization's information security policy, topic-specific policies and procedures, as relevant for their job function.

In particuar, in Sinch:

- All employees completed within 3 weeks of start date
- All employees carried out ISA-training during the last 12 months

CONFIDENTIAL
08 August 2023 4:01:57 PM

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

- The content of ISA-training is updated every 12 months

## 6) Capacity management

The use of resources is monitored and adjusted in line with current and expected capacity requirements.

## 7) Protection against malware

Protection against malware is implemented and supported by appropriate user awareness. All endpoint devices should have EDR Endpoint detection.

## 8) Management of technical vulnerabilities

Information about technical vulnerabilities of information systems in use is obtained, Sinch's exposure to such vulnerabilities is evaluated and appropriate measures are taken.

In particular, in Sinch:

- Vulnerability Scan every 7 days.

- Apply security patches to all components of the application stack with severity score higher than "Medium" as determined by the issuer of the patch within one month (30 days) after release

- Pen test every 12 months black box manual.

## 9) Configuration Management

Configurations, including security configurations, of hardware, software, services and networks is established, documented, implemented, monitored and reviewed against the following standards: NIST 800-53 and CIS Controls.

## 10) Information Backup

Backup copies of information, software and systems are maintained and regularly tested in accordance with the agreed topic-specific policy on backup.

The backup routine at least specifies:

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

- Backup intervals (minimum weekly)

- Retention requirements

- Location for backup storage

- Extent of backup (e.g. data, configurations, full system backup)

- Backup strategy (e.g. online versus offline, number of backups, relation between full and incremental backup)

- Backup restore tests shall be performed at least quarterly for business-critical systems and at least annually for all others and the tests

## 11) Monitoring activities

Networks, systems and applications are monitored for anomalous behaviour and appropriate actions taken to evaluate potential information security incidents. Networks, systems and application are monitored for anomalous and malicious behaviour in order to detect potential security incidents.

## 12) Network Security

Networks and network devices are secured, managed and controlled to protect information in systems and applications.

For instance, Sinch:

- Encrypt data at rest on servers, applications, and databases (AES256 Minimum). Encrypt data in transit (TLS 1.2 or higher).

- Appropriately logging and monitoring to enable recording and detection of actions that can affect, or are relevant to, information security including EDR

- Product owner must maintain up-to-date documentation including network diagrams and configuration files of devices (e.g. routers, switches).

- Restrict and filter systems connection to the network both incoming and outgoing e.g. using firewalls to minimize exposed assets both internally and externally.

- Hardening of network devices

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL                                                                ADOBE_PIET_000051

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

- Segregating network administration channels from other network traffic.

- Temporarily isolating critical subnetworks (e.g. with drawbridges) if the network is under attack.

## 13) System life cycle management

Rules for the secure development of software and systems are established and applied.

For instance, in Sinch:

- The system is designed in a secure way utilizing threat modelling as required.

- There is a plan to maintain the system in line with the vulnerability management control

- There is an owner of the system

- There is a plan to replace the system (zero legacy policy)

## 14) Security testing in development and acceptance

Security testing processes are defined and implemented in the development life cycle.

- SAST and vulnerability & secrets detection scans in CICD pipelines. If possible DAST

- No critical or high vulnerabilities remediated before available for customers

- Securely manage network infrastructure.

- All projects follow Product Release Security Checklists

## 15) Measures for ensuring physical security of locations at which personal data are processed

Physical and environmental security measures have been implemented within Sinch.

For instance, in Sinch:

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000052

DocuSign Envelope ID: 4134994B-581A-4591-A15F-C399F60478A5

- Security perimeters are defined and used to protect areas that contain information and other associated assets.

- Secure areas are protected by appropriate entry controls and access points.

- Physical security for offices, rooms and facilities are designed and implemented.

- Premises are continuously monitored for unauthorized physical access.

- Protection against physical and environmental threats, such as natural disasters and other intentional or unintentional physical threats to infrastructure are designed and implemented.

- Security measures for working in secure areas are designed and implemented.

- Clear desk rules for papers and removable storage media and clear screen rules for information processing facilities are defined and appropriately enforced.

- Equipment is sited securely and protected.

- Off-site assets are protected.

- Storage media is managed through their life cycle of acquisition, use, transportation and disposal in accordance with the organization's classification scheme and handling requirements.

- Information processing facilities are protected from power failures and other disruptions caused by failures in supporting utilities.

- Cables carrying power, data or supporting information services are protected from interception, interference or damage.

- Equipment is maintained correctly to ensure availability, integrity and confidentiality of information.

- Items of equipment containing storage media are verified to ensure that any sensitive data and licensed software has been removed or securely overwritten prior to disposal or re-use.

Sinch has also applied an Information Security Management System (ISMS), according to ISO/IEC 27001:2022.

## 16) Measures for ensuring limited data retention

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000053

Measures to ensure limited personal data retention have been implemented.

For instance, Sinch:

- Established a data retention policy, which clearly defines the specific types of data that will be collected, how long it will be retained, and when it will be deleted.

- Implemented automated deletion processes.

- Regularly reviews and updates the retention policy.

- Limits data collection to only what is necessary for the specific business purpose.

- Trains employees on data retention.

- Regularly reviews and monitors data retention

- Uses encryption to protect data that is retained, to reduce the risk of unauthorized access or disclosure.

## 17) Measures for ensuring accountability

Appropriate technical and organisational measures have been implemented to meet the requirements of accountability.

For instance, Sinch:

- Adopted and implemented data protection policies.

- Took a 'data protection by design and default' approach.

- Put written contracts in place with organisations that process personal data on Sinch's behalf.

- Documented its processing activities.

- Carried out data protection impact assessments.

- Appointed a Group DPO

## 18) Measures for allowing data portability and ensuring erasure

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

Measures to allow the exercise of data subject rights are implemented within Sinch.

For instance, Sinch:

- Erases personal data from back-up systems as well as live systems where necessary, and it clearly tells the individual what will happen to their data.

- Contacts each recipient to inform them about the erasure, if the personal data is disclosed to others, unless this is impossible or involves disproportionate effort. If personal data has been made public in an online environment, the organisation takes reasonable steps to tell other controllers, if they are processing it, to erase links to, copies or replication of that data.

- Informs the data subject which third parties have received the personal data whenever requested.

- Provides personal data in a structured, commonly used and machine readable format, where requested. Where possible and if an individual requests it, the organisation can directly transmit the information to another organisation.

## 19) Measures for ensuring data minimisation

Measures to minimize the amount of data processed are implemented.

For instance, for each processing activity Sinch:

- Implemented measures that ensure that the collection of personal data is adequate, relevant and strictly limited to what is necessary in relation to the purposes for which they are processed.

- Has assessed that it cannot achieve the purposes of its processing activity with less privacy invasive data (e.g. working with less granular data) or intrusive process (i.e. using less intrusive means).

- Documented the requirement for each data field in relation to the purpose.

CONFIDENTIAL
08 August 2023 4:01:57 PM

DocuSign Envelope ID: 4134994B-581A-4591-A15F-C399F60478A5

## ATTACHMENT B

# MESSAGING SUPPLEMENTAL TERMS AND CONDITIONS

Version 6 - Date of release: 7 February 2023.

These supplemental terms and conditions ("**Supplement**") are part of an agreement for certain SINCH services ("**Agreement**") between SINCH and Customer and apply solely to the SINCH services referencing this Supplement, including SMS and/or MMS services ("**Service**") and not any other SINCH product or service.

Capitalized terms are defined in the Glossary below. Capitalized terms not defined in this Supplement shall have the meanings ascribed to them in the General Terms and Conditions for SINCH Services ("**GTC**").

## Part A – Legal Terms

### A1. Services

**A1.1. Service Provider Conditions and laws and regulations**. Notwithstanding Section 4.1 of the GTC, Customer shall comply with all Service Provider Conditions, applicable legal and regulatory requirements and conditions, and all applicable industry guidelines relating to the Customer Data, Customer Services, Messages or its use of the Service. If a Service Provider changes the Service Provider Conditions and/or the technical standards for the delivery of Service, SINCH may modify the terms and conditions governing such Service upon written notice to Customer.

**A1.2. End User opt-in/opt-out requirements.** Customer shall send Messages only to End Users who have, and continue to, knowingly consent or "opt-in" to receiving them and who have been informed of their rights to, and been given, a free, readily accessible process for cancelling receipt or "opting-out" of receiving future Messages, such as via End User text responses of STOP, QUIT, CANCEL, OPT-OUT, and/or UNSUBSCRIBE. Customer shall immediately stop sending Messages to an End User who has "opted-out" from receiving such Messages.  At Sinch's request, Customer shall provide Sinch with proof of any and all

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

such opt-in(s) and opt-out(s), and response time to discontinue transmission of Messages after opt-out, to Sinch's reasonable satisfaction.

**A1.3. Supply of Customer Services**. Customer shall inform End Users that it is the source and supplier of the Messages and provide appropriate contact details to End Users. Customer shall bear sole responsibility for the acts, omissions or breaches of End Users with respect to the use of the Service, Customer Services and the Messages, including but not limited to the Customer Data. Customer shall promptly inform SINCH if it becomes aware of any violation of the terms of this paragraph.

**A1.4. Restrictions**. Customer shall not use the Service or permit the Service to be used:

   (a) in a manner that violates any applicable law, regulation, industry guidelines, or code of practice, or that violates, infringes or misappropriates the rights of any third party;

   (b) to transmit any Message or any electronic material (including viruses or other similar destructive computer programming routines) which causes, or is likely to cause, detriment or harm or damage to the SINCH Network or any computer systems or telecommunications equipment or mobile handsets owned by SINCH or any other person, or to facilitate the transmission or use of any code that would allow any third party to interfere with or access any Customer Data;

   (c) to send spam, "junk mail" or unsolicited advertising or promotional Messages or material, or to send or knowingly receive or use any Message or material which is obscene, offensive, abusive, harassing, misleading, fraudulent, violent, unethical, indecent, defamatory, discriminatory, threatening, libelous, unlawful or menacing or promotes alcohol abuse or illegal drug use; or

   (d) to send any Messages that contain medical and/or life-threatening emergency information if the such Message is the sole transmission channel to the End User with respect to such emergency.

A2. Compliance

**A2.1.    Requirements.** The provisions of Sections 2.5 and 4.1(c) of the GTC shall apply equally to requests, directions and/or orders made or issued by any Service Provider.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

**A2.2. Responsibility**. SINCH may, in its sole discretion, require Customer to take primary responsibility for any request or enquiry made under Section A2.1 above relating to any Customer Service, Message(s) or Customer Data or arising from Customer's use of the Service or from an alleged or actual breach of this Agreement by Customer.

Customer agrees, at its own cost, to accept full responsibility for any such request or enquiry including for any expenses, penalties, fines, sanctions or other analogous costs that may arise, and in relation to such request or enquiry, to provide all requested information to such regulator or Service Provider (with copies to SINCH) in a timely manner.

**A2.3. Effect of Termination**. Sections A1.2 ("**End User opt-in/opt-out requirements**") and A1.3 ("**Supply of Customer Services**") above shall survive termination of the Agreement.

**A2.4. Indemnity**. Customer will indemnify and, at SINCH's election, defend SINCH, its Affiliates and subcontractors against:

   (a) any claims (including, but not limited to, any claims, fines, penalties, or losses) or other liabilities brought against SINCH, its Affiliates and subcontractors by any third party (including, but not limited to, any other SINCH customer, Service Provider or governmental or regulatory authority) relating to Customer Data, Customer Services, Messages or Customer's use of the Service (including, but not limited to, any such claim which relates to infringement or misappropriation of any intellectual property rights of any third party or any breach or violation of laws or regulations); and

   (b) all damages finally awarded against SINCH, its Affiliates and subcontractors with respect to these claims.

**A2.5. Disclaimer**. Customer agrees that, with respect to its supply of the Service, neither SINCH nor any SINCH supplier shall be liable whether in contract, tort, or strict liability to Customer or to any End User or any other customer of Customer for (i) any Messages deleted or not delivered regardless of the reason for deletion or non-delivery, including, without limitation, message processing errors, transmission errors, or messaging network and/or service failures; or (ii) the accuracy of information provided through the Service.

# Part B – Business Terms

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000058

B1. Customer Responsibilities

## B1.1. Access and Connectivity

**(a) SINCH Network connection**. Customer is solely responsible, at its own expense, for establishing and maintaining its equipment, software, facilities, and its connection to the SINCH Network.

**(b) SINCH Dashboard**. SINCH may, in its sole discretion, provide Customer with access to SINCH's world wide web extranet interface ("**SINCH Dashboard**") which access will enable Customer to obtain statistical reports detailing Service activity. Access to the SINCH Dashboard is provided to Customer for informational purposes only, and the data and information displayed are provided without warranties of any kind regarding completeness or accuracy. Customer agrees not to use or rely on such data and information in accounting for monies due between the parties or for billing purposes.

**(c) Access Numbers**. Customer acknowledges that the Access Numbers used to deliver Customer Services remain at all times the property of and are subject to the applicable terms and conditions imposed by the entity authorized to administer such Access Numbers. Access Numbers to be used to deliver Service for a Customer Service may at SINCH's sole discretion be obtained by SINCH for Customer, if requested by Customer pursuant to the applicable Order Form and subject to availability. The Customer may not use the Access Numbers except for in relation to the provisioning of the Service by Sinch.

**(d) Traffic Forecasts**. Customer shall provide to SINCH timely and accurate forecasts of proposed maximum Message volumes, including peak hour, monthly and quarterly volumes. Where the actual Message traffic exceeds one hundred and twenty percent (120%) of the forecasted volume ("**Burst**") SINCH may without any liability to Customer immediately suspend the Service. Where Customer does not submit such forecasts SINCH may, at its sole discretion, determine the volume of Messages that constitutes a Burst.

**B1.2. Commercial Messages**. Customer acknowledges that the Service is intended solely for Commercial Messages and shall not be used for mobile to mobile peer to peer messaging purposes. For the purpose of this Section, "Commercial Messages" means Messages designed to promote or facilitate, directly or indirectly, the goods, services or image of any person or entity pursuing a commercial activity.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

DocuSign Envelope ID: 413499AB-581A-4531-A15F-C399E60478A5

B2. Commercial Terms

**B2.1. Price Changes**.  Unless otherwise agreed in an Order Form, Sinch may modify any fees in its sole discretion upon written notice.

Glossary

1.1 "**Access Number**" means a set of digits used to enable Customer to send and/or receive Messages or calls as part of a Customer Service. Access Numbers shall include 'short-codes' and 'long-codes' as applicable.

1.2 "**Customer Service**" means a marketing, advertising, promotional or informational program or initiative, or other project, conducted by Customer utilizing the Service.

1.3 "**End User**" means a person or entity that is a user and/or recipient of a Customer Service.

1.4 "**Message**" means a digital message containing Customer Data in a form for delivery via Short Message Service (SMS), Multi-Media Messaging Service (MMS) technology, Internet Protocol (IP) or other technology, protocols or standards used to transmit mobile digital content or information.

1.5 "**Service Provider**" means any entity, including, but not limited to, mobile network operators and mobile messaging aggregators, that is used in relation to the supply of the Service.

1.6 "**Service Provider Conditions**" means the rates, terms and conditions and "codes of conduct" or message content rule and restrictions imposed by the applicable Service Providers on the provision of the Service and conduct of Customer Services as a condition of permitting SINCH to provide the Service and Customer to conduct Customer Services, whether such Service Provider Conditions are incorporated in the terms of this Agreement or provided by SINCH to Customer in writing or by email from time to time.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000060

DocuSign Envelope ID: 4134994B-581A-4581-A15F-C399F60478A5

## ATTACHMENT C

# GENERAL TERMS AND CONDITIONS

Version 7 - Date of release: 7 July 2023.

GENERAL TERMS AND CONDITIONS FOR SINCH SERVICES ("GTC")


## 1. DEFINITIONS

Capitalized terms are defined in the Glossary at the end of this document.

## 2. SUPPLY OF SERVICE AND RESTRICTIONS

### 2.1 Supply of Service.

Subject to the terms of the Agreement, SINCH will make the Service available to Customer.

### 2.2 Grant of Rights.

SINCH grants to Customer a non-exclusive and non-transferable right to use the Service as permitted under the Agreement solely for the Customer's internal business operations.

### 2.3 Acceptable Use Policy.

With respect to the Service, Customer shall not:

(a) except to the extent such rights cannot be validly waived by law, disassemble, decompile, reverse-engineer, copy, translate or make derivative works,

(b) market, rent, sell, lease or use for non-civilian purposes,

(c) transmit any content or data that is unlawful, including without limitation any unlawful voice calls, or infringes any intellectual property rights, or

**Page 35 of 65**

(d) circumvent or endanger Sinch's operation or security.

## 2.4 Monitoring.

SINCH may, but is under no obligation to, monitor use of the Service (only to the extent allowed by applicable law):

(a) to comply with applicable law, regulation, or other governmental request or order including disclosing Customer Data in accordance with such law, regulation, request or order;

(b) to verify Customer's compliance with the Agreement;

(c) to protect the integrity of its systems and networks and those of its suppliers;

(d) as necessary to provide and support the Service; or

(e) as otherwise approved or requested by Customer.

## 2.5 Compliance.

Customer shall promptly provide any information as SINCH may request relating to Customer Data or Customer's use of the Service:

(a) to determine Customer's compliance with the Agreement, and

(b) in response to any request made by any regulatory or governmental or statutory body.

## 2.6 Operating Instructions.

Customer shall comply, and use the Service in accordance, with the operating guidelines and policies relating to the use of the Services.

## 2.7 Suspension of Service.

SINCH may suspend use of the Service:

(a) as necessary to comply with applicable law or regulation;

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

DocuSign Envelope ID: 413498AB-581A-4581-A15F-C399F60478A5

(b) to perform maintenance (whether planned or emergency) or repair to the SINCH Network;

(c) if the use poses a threat to the integrity or continued operation of the SINCH Network or any part of it;

(d) if the use is in breach of the Agreement or otherwise exposes SINCH to legal liability;

(e) in SINCH's sole discretion, if not doing so would have a material harm on the Services or SINCH's provision thereof; or

(f) if SINCH is unable to provide the Service due to a termination or alteration of SINCH's relationship with any third party or the termination or suspension of any license or authorization necessary to provide the Service.

SINCH will promptly notify (email permitted) Customer of the suspension. SINCH will endeavor to limit the suspension in time and scope as reasonably possible under the circumstances, and will resume the Service once the cause of the suspension has been remedied, provided that if a suspension is due to Customer's actions or inactions, SINCH will resume the Service once Customer has remedied the cause of the suspension and Customer will pay any applicable reconnection charge or, if no charge is specified, Customer shall reimburse SINCH for all reasonable costs and expenses incurred by SINCH in resuming the Service and further provided that SINCH may terminate the Agreement if Customer does not remedy the cause of the suspension within thirty (30) days.

## 2.8 Third Party Services and Application.

The Service may include integrations with web services, software and/or application by third parties (other than SINCH or its Affiliates) that are accessed through the Service and subject to terms and conditions with those third parties.

## 2.9 Anti-Fraud

SINCH adopts measures to identify and prevent fraud and illegal practices during the use of the Service, including, without limitation, the verification of links inserted by the Customer during the use of the Service. SINCH does not represent that it will be able to block or prevent the transmission of fraudulent messages or voice calls. Customer is responsible for

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL                                                  ADOBE_PIET_000063

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

ensuring that its account is not used to transmit fraudulent messages or voice calls. Fraud, including artificial inflated traffic originating from the Customer, will not excuse Customer's payment obligations under the Agreement.

## 3. SINCH RESPONSIBILITIES

### 3.1 Provisioning.

SINCH provides access to the Service as described in the Order Form.

### 3.2 Support.

SINCH provides support for the Service as referenced in the Order Form.

### 3.3 Modifications.

(a) The Service may be modified by SINCH. SINCH will inform Customer of modifications by email, the support portal, release notes, Documentation or the Service. The information will be delivered by email if the modification is not solely an enhancement. Modifications may include optional new features for the Service, which Customer may use subject to the then- current Supplement and Documentation.

(b) If Customer establishes that a modification by SINCH causes a materially adverse impact on Customer's use of the Service and is not reasonably acceptable to Customer for legitimate business reasons, Customer may terminate its access to the affected Service by providing written notice to SINCH within thirty (30) days of such modification.

### 3.4 Excluded Events.

Notwithstanding any provision to the contrary in the Agreement, SINCH shall not be liable for any failure to perform or any delay in performing an obligation under the Agreement if such failure or delay arises as a result of or in connection with the occurrence of an Excluded Event.

## 4. CUSTOMER RESPONSIBILITIES AND CUSTOMER DATA

### 4.1 Customer Obligations.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000064

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

Customer shall:

   (a) comply with all laws and regulations applicable to it in connection with the Customer Data and Customer's use of the Service, including but not limited to telecommunications laws and regulations, export control laws and regulations, economic, trade and financial sanctions laws, regulations, embargoes, restricted state lists or restrictive measures administered.

   (b) continue to obtain all necessary permits, consents, rights, authorisations, or certifications for its use of the Service, including, but not limited to, any Customer Data transmitted as part of that use; and

   (c) immediately comply with such directions and/or orders as may be issued from time to time by a governmental or regulatory authority in relation to the Customer Data or its use of the Service and shall cooperate with SINCH's request for assistance in conforming the Service to any new requirements or determinations.

## 4.2 Customer Data.

Customer is solely responsible for all Customer Data. Customer (i) grants to Sinch (including its Affiliates and subcontractors) a nonexclusive, worldwide right to use, modify, adapt and process Customer Data to analyse, develop, test, and operate, provide and support the Services and/or any of products of SINCH and its Affiliates and (ii) acknowledges that neither SINCH, its Affiliates, nor their respective suppliers exercise any control over Customer Data, and act as a mere or passive conduit in transmitting and handling Customer Data.

Customer acknowledge and agree that any Messages sent through Sinch are deemed to have been sent and/or authorised by Customer.

## 4.3 Personal Data.

Customer will collect and maintain all Personal Data necessary to utilise the Service, and all required consents associated with such Personal Data, in compliance with applicable Data Protection Laws.

## 4.4 Co-operation

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

DocuSign Envelope ID: 4134994B-581A-4581-A15E-C399F60478A5

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

The Customer shall reasonably co-operate with SINCH in SINCH's supply and support of a Service, including any diagnostic or other maintenance or upgrade activities.

## 4.5 Access and Security.

Customer has the sole and exclusive responsibility for the installation, configuration, security (including firewall security), and integrity of all Customer facilities, systems, equipment, proxy servers, software, networks, network configurations and the like (the "Customer Equipment") used in conjunction with or related to the Service(s) provided by SINCH, including, without limitation, Customer's connectivity to any third party. Customer will maintain reasonable security standards to protect the SINCH Network from unauthorised access, including, but not limited to, protecting Customer's passwords from being disclosed to or accessed by third parties. Customer shall promptly inform SINCH if the Customer becomes aware of any possible or actual unauthorised use, misuse or access of the Service.

## 4.6 Disaster Recovery.

Customer is solely responsible for all disaster recovery, business continuity and back up arrangements in respect of its own equipment and all of its Customer Data.

**4.7. Test Account**. Sinch may make an account available to the Customer for the purposes of non-productive testing, demonstration and evaluation of certain Services. The terms of the Agreement shall govern the Customer's use and access to such test account and test Services. The Customer shall ensure that the test account and test Services are used strictly for the purpose of non-production testing, demonstration and evaluation, and not for any productive, commercial or other purpose. The Customer shall not connect the test Services to a productive IT environment. The Customer shall comply with any relevant instructions or protocols Sinch notifies the Customer of in relation to the test account and test Services. The Customer agrees that Sinch can withdraw such test account and test Services at any time (with or without notice to the Customer).

## 5. FEES AND TAXES

### 5.1 Fees and Payment.

CONFIDENTIAL
08 August 2023 4:01:57 PM

DocuSign Envelope ID: 413498AB-581A-4591-A15F-C399F60478A5

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

Customer will pay fees as stated in the Order Form. For nonpayment, SINCH may, after prior written notice, suspend Customer's use of the Service until payment is made. Customer cannot withhold, reduce or set-off fees owed during the Term. For any invoice the Customer fails to pay by its due date, interest will thereafter accrue on such unpaid amount at the maximum allowable rate. The fees payable shall be calculated by reference to data recorded or logged by Sinch and not by reference to any data recorded or logged by the Customer. Invoices issued by Sinch shall be final, conclusive and binding on the Customer, provided that the Customer may dispute an invoice in writing and in good faith no later than within thirty (30) days from the date of invoice but further, provided that Customer will timely pay any undisputed part of such invoice. No omission or delay by Sinch in invoicing any sums shall prohibit Sinch from raising an invoice at a later date nor shall it relieve the Customer of the Customer's liability to pay.

### 5.2 Taxes.

Unless otherwise stated in an Order Form, fees and other charges imposed under an Order Form will not include taxes, including withholding taxes, all of which will be for Customer's account. Customer is responsible for all taxes including withholding taxes, other than SINCH's income and payroll taxes. If SINCH is required to pay taxes (other than its income and payroll taxes), Customer will reimburse SINCH for those amounts and indemnify SINCH for any taxes and related costs paid or payable by SINCH attributable to those taxes.

### 5.3 Set-off.

SINCH may, without notice to the Customer, set-off any sums owed by the Customer under this Agreement and/or any other agreement with SINCH against any sums owed by SINCH to Customer regardless of the place of payment or currency of such obligations.

### 6. TERM AND TERMINATION

### 6.1 Term.

The Term is as stated in the Order Form.

### 6.2 Termination by Either Party.

A party may terminate the Agreement:

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

DocuSign Envelope ID: 413498AB-581A-4581-A15F-C399F60478A5

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

(a) upon thirty (30) days written notice of the other party's material breach unless the breach is remedied during that thirty-day period;

(b) as permitted under Sections 3.3(b), 7.3(b), or 8.1(c) (with termination effective thirty (30) days after receipt of notice in each of these cases); or

(c) immediately if the other party files for bankruptcy, becomes insolvent, or makes an assignment for the benefit of creditors, or otherwise materially breaches Sections 11 or 13.6.

### 6.3 Termination by SINCH.

In addition to the termination rights set out in Section 6.2, SINCH may also terminate the Agreement or any specific Service being affected at any time:

(a) upon any termination of a network operator, third-party subcontractor, supplier, or interconnected carrier relationship with SINCH or its Affiliates or the discontinuance of support for equipment or a component of service necessary for SINCH to provide the Service;

(b) upon any legal, regulatory or governmental prohibition or limitation affecting the Service; or

(c) upon the termination or expiry of any license necessary to provide the Service.

Sinch will endeavor to limit the termination in time and scope as reasonably possible under the circumstances. In addition, Sinch may terminate the entire Agreement immediately, without prejudice to the other clause in the Agreement and in applicable legislation, if any illegal practice and/or fraudulent use of the Service is proven.

### 6.4 Effect of Expiration or Termination.

Upon the effective date of expiration or termination of the Agreement:

(a) Customer's right to use the Service and all SINCH Confidential Information will end;

(b) SINCH will cease providing the applicable Service;

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000068

DocuSign Envelope ID: 413499B-581A-4531-A15F-C399F60478A5

(c) Confidential Information of the disclosing party will be returned or destroyed as required in writing by the disclosing party;

(c) Customer shall promptly pay to SINCH all outstanding amounts due under the Agreement; and

(d) termination or expiration of the Agreement does not affect other agreements between the parties.

## 6.5 Survival.

Sections 1, 2.4, 2.5, 5, 6.4, 6.5, 8, 9, 10, 11, and 13 will survive the expiration or termination of the Agreement.

## 7. WARRANTIES

## 7.1 Compliance with Law.

Each Party warrants its current and continuing compliance with all laws and regulations applicable to it in connection with (i) in the case of Sinch, the operation of SINCH's business as it relates to the Service and (ii) in the case of Customer, the Customer Data and the Customer's use of the Services.

## 7.2 Disclaimer.

Except as expressly provided in the Agreement, neither SINCH nor its subcontractors make any representation or warranties, and SINCH and its subcontractors disclaim all representations, warranties, terms, conditions or statements, which might have effect between the parties or be implied or incorporated into this Agreement or any collateral contract, whether by statute, common law or otherwise, all of which are excluded to the fullest extent permitted by law including the implied conditions, warranties or other terms as to merchantability, suitability, originality, or fitness for a particular use or purpose. In addition, except as expressly provided in this Agreement, neither SINCH nor its subcontractors make any representations, warranties, terms, conditions or statements of non-infringement or results to be derived from the use of or integration with any products or services provided under the Agreement, or that the operation of any products or services will be secure, uninterrupted or error free. Customer agrees that it is not relying on delivery of

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

DocuSign Envelope ID: 413499AB-581A-4581-A15F-C399F60478A5

future functionality, public comments or advertising of SINCH or product roadmaps in entering into the Agreement. Customer acknowledges that (i) the Service has not been specifically designed to meet its and/or any of its customer's or end-user's individual requirements; and (ii) the Service will not be error- free, uninterrupted, or free from unauthorised access. Except as expressly stated in this Agreement, the Service is provided on an 'as is' and 'as available' basis.

## 8. THIRD PARTY CLAIMS

### 8.1 Claims Brought Against Customer.

(a) SINCH will defend Customer against claims brought against Customer by any third party alleging that Customer's use of the Service infringes or misappropriates a patent claim, copyright, or trade secret right. SINCH will indemnify Customer against all damages finally awarded against Customer (or the amount of any settlement SINCH enters into) with respect to these claims.

(b) SINCH's obligations under Section 8.1 will not apply if the claim results from (i) Customer's breach of the Agreement; (ii) use of the Service in conjunction with any product or service not provided by SINCH, or (iii) use of the Service provided for no fee.

(c) in the event a claim described in Section 8.1(a) is made or likely to be made, SINCH may (i) procure for Customer the right to continue using the Service under the terms of the Agreement, or (ii) replace or modify the Service to be non-infringing without material decrease in functionality. If these options are not reasonably available, SINCH or Customer may terminate Customer's access to the affected Service upon written notice to the other.

### 8.2 Third Party Claim Procedure.

(a) Customer will timely notify SINCH in writing of any claim.

(b) SINCH will have the right to fully control the defense (and SINCH shall be free to delegate such claim to its third party insurer or indemnifier).

(c) Customer shall fully cooperate in the defense of such claim and shall not undertake any action that is prejudicial to SINCH's rights.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000070

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

(d) The Customer shall not undertake any action in response to any infringement or misappropriation, or alleged infringement or misappropriation that is prejudicial to SINCH's rights.

## 8.3 Exclusive Remedy.

The provisions of Section 8 state the sole, exclusive, and entire liability of SINCH, its Affiliates, and subcontractors to Customer, and is Customer's sole remedy, with respect to third party claims and to the infringement or misappropriation of third party intellectual property rights.

## 9. LIMITATION OF LIABILITY

## 9.1 Unlimited Liability.

Neither party will exclude or limit its liability for damages resulting from:

(a) SINCH's obligations under Section 8.1(a);

(b) Customer's obligations under any Indemnity;

(c) unauthorised use or disclosure of Confidential Information;

(d) fraud or fraudulent misrepresentation;

(e) death or bodily injury arising from either party's gross negligence or willful misconduct;

(f) any failure by Customer to pay any fees due under the Agreement; or

(g) any liability that cannot be excluded or limited by applicable law.

## 9.2 Liability Cap.

Subject to Sections 9.1 and 9.3, under no circumstances and regardless of the nature of the claim, shall the maximum aggregate liability of either party (or its respective Affiliates or SINCH's subcontractors) to the other party or its Affiliates or any other person or entity (howsoever arising) under or in connection with this Agreement including (but not limited

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

to) liability for breach of contract, tort (including but not limited to negligence), misrepresentation (whether tortious or statutory), breach of statutory duty, breach of warranty, claims by third parties from any repudiatory, material, or other breach (however minor) of this Agreement (whether or not intentional), from willful misconduct or otherwise, exceed EUR 10,000 for all events (or series of connected events) arising in any twelve (12) month period Any "twelve (12) month period" commences on the Term start date or any of its yearly anniversaries.

### 9.3 Exclusion of Damages.

Subject to Section 9.1:

(a) Under no circumstances shall either party (nor its respective Affiliates or SINCH's subcontractors) be liable to the other party or its Affiliates or any other person or entity (whether or not the other party had been advised of the possibility of such loss or damage) for any of the following types of loss or damage arising under or in relation to this Agreement (whether arising out of liability under breach of contract, tort (including but not limited to negligence), misrepresentation (whether tortious or statutory), breach of statutory duty, breach of warranty, claims by third parties from any repudiatory, material, or other breach (however minor) of this Agreement (whether or not intentional)):

(a) (i) any loss or inaccuracy of data, (ii) loss of profits, (iii) loss of business, (iv) loss resulting from business disruption, (v) loss of contracts, (vi) loss of revenue, (vii) loss of anticipated savings, (viii) loss of goodwill, (ix) loss of reputation, (regardless of whether these types of loss or damage listed in this sub-clause (A) are direct, indirect, special or consequential); or

(b) any special, incidental, consequential, or indirect losses or damages or for exemplary or punitive damages;

(b) SINCH will not be liable for any damages caused by any Service provided for no fee.

### 9.4 Risk Allocation.

The Agreement allocates the risks between SINCH and Customer. The fees for the Service reflect this allocation of risk and limitations of liability.

CONFIDENTIAL
08 August 2023 4:01:57 PM

DocuSign Envelope ID: 413499HB581A-451A-815F-C399F60478A5

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

## 10. INTELLECTUAL PROPERTY RIGHTS

### 10.1 SINCH Ownership.

SINCH, its Affiliates or licensors own all intellectual property rights in and related to the Service, Documentation, design contributions, related knowledge or processes, and any derivative works of them, including any feedback Customer may provide to Sinch about the Service in connection with Customer's use of the Service. All rights not expressly granted to Customer are reserved to SINCH, its Affiliates and its licensors.

### 10.2 Customer Ownership.

Customer retains all rights in and related to the Customer Data as between Customer and SINCH.

### 10.3 Non-Assertion of Rights.

Customer covenants, on behalf of itself and its successors and assigns, not to assert against SINCH, its Affiliates or licensors, any rights, or any claims of any rights, in any Service or Documentation.

## 11. CONFIDENTIALITY

### 11.1 Use of Confidential Information.

(a) The receiving party will protect all Confidential Information of the disclosing party as strictly confidential to the same extent it protects its own Confidential Information, and not less than a reasonable standard of care. Receiving party will not disclose any Confidential Information of the disclosing party to any person other than its personnel or representatives or those of its Affiliates whose access is necessary to enable it to exercise its rights or perform its obligations under the Agreement and who are under obligations of non-disclosure and non-use at least as strict as those in Section 11. Customer will not disclose the Agreement or the pricing to any third party.

(b) Confidential Information of either party disclosed prior to execution of the Agreement will be subject to Section 11.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000073

DocuSign Envelope ID: 4134994B-581A-4591-A15E-C399E60478A6

(c) The receiving party will return or destroy all Confidential Information promptly after being requested to do so by the disclosing party.

## 11.2 Exceptions.

The restrictions on use or disclosure of Confidential Information will not apply to any Confidential Information that:

(a) is independently developed by the receiving party without reference to the disclosing party's Confidential Information;

(b) is available to the public without breach of the Agreement by the receiving party;

(c) at the time of disclosure, was known to the receiving party free of confidentiality restrictions; or

(d) the disclosing party agrees in writing is free of confidentiality restrictions.

## 11.3 Compelled Disclosure

The receiving party may disclose Confidential Information pursuant to a lawful requirement or request from a court or governmental agency (including pursuant to of stock market rule or regulation); provided that prior to making any disclosure, the receiving party will (a) give the disclosing party written notice, to the extent commercially practicable and not otherwise prohibited by law, sufficient to allow the disclosing party to seek a protective order or other appropriate remedy and (b) disclose only that portion of the Confidential Information it is required to disclose, based on advice of its counsel, to comply with such legal requirement, and will use commercially reasonable efforts to obtain confidential treatment for any of the Confidential Information so disclosed.

## 11.4 Publicity.

Neither party will use the name of the other party in publicity activities without the prior written consent of the other, except that Customer agrees that SINCH may use Customer's name and logo in customer listings or quarterly calls with its investors or, at times mutually agreeable to the parties, as part of SINCH's marketing efforts (including reference calls and stories, press testimonials, site visits). Customer agrees that SINCH may share information

CONFIDENTIAL
08 August 2023 4:01:57 PM

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

on Customer with its Affiliates for marketing and other business purposes and that it has secured appropriate authorisations to share Customer employee contact information with SINCH.

## 12. DATA PROTECTION

1.
   1. **Data Controller.**

The Customer acknowledges that SINCH shall act as an independent Data Controller with respect to the processing of Personal Data that is necessary to provide its communications services and carry out its necessary functions and business as a communication services provider, including necessary measures to prevent spam and fraud and measures for control, security, and maintenance of its network, management of its business and compliance functions, consistent with its obligations under applicable laws including Data Protection Law.

**12.2 Data Processor.**

When SINCH processes Personal Data on behalf of the Customer (in accordance with Data Protection Law), SINCH can be qualified as a Data Processor and the Customer as a Data Controller as defined within this Agreement and the DPA applicable on the service.

   (a) The parties agree that, when SINCH acts as a Data Processor under applicable Data Protection Law, the DPA is applicable.

   (b) Each Party shall comply with applicable Data Protection Law. The Customer has the obligation to inform Sinch, in writing, about the Data Protection Law applicable to such processing of Personal Data for which the Customer is the Data Controller and SINCH is Data Processor.

   (c) The Customer represents and warrants, and covenants that the Customer has and will maintain all necessary rights, licenses and consents to provide Sinch with Customer Data. Sinch may require that Customer provides evidence thereof whenever necessary and in accordance with the terms of the Agreement.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000075

(d) The Customer acknowledges and agrees that Sinch may retain, store, use and disclose Customer Data to the extent necessary to provide and improve the Services and to satisfy applicable legal, accounting or regulatory requirements. SINCH will establish processes to ensure compliance with applicable laws.

## 13. MISCELLANEOUS

### 13.1 Severability.

If any provision of the Agreement is held to be invalid or unenforceable, the invalidity or unenforceability will not affect the other provisions of the Agreement.

### 13.2 No Waiver.

A waiver of any breach of the Agreement is not deemed a waiver of any other breach.

### 13.3 Electronic Signature.

Electronic signatures that comply with applicable law are deemed original signatures.

### 13.4 Regulatory Matters.

SINCH Confidential Information is subject to export control laws of various countries. Customer will not submit SINCH Confidential Information to any government agency for licensing consideration or other regulatory approval, and will not export SINCH Confidential Information to countries, persons or entities if prohibited by export laws.

### 13.5 Notices.

All notices will be in writing and given when delivered to the address set forth in an Order Form with copy to the legal department. Notices by SINCH relating to the operation or support of the Service, and as otherwise permitted in the GTC or an Order Form (including, but not limited to, those under Sections 2.7 and 5.1 of this GTC) may be in the form of electronic mail to Customer's authorised representative or administrator, with such notice deemed to have been given upon dispatch from SINCH's email server.

### 13.6 Assignment.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

DocuSign Envelope ID: 413499AB-581A-4581-A15F-C399E60478A5

Without SINCH's prior written consent, Customer may not assign or transfer the Agreement (or any of its rights or obligations) to any party. SINCH may assign the Agreement to any of its Affiliates. Any attempted assignment in violation of the provisions of this Section will be void ab initio.

### 13.7 Subcontracting and use of Affiliates.

SINCH may subcontract parts of the Service to third parties. SINCH is responsible for breaches of the Agreement caused by its subcontractors. Nothing shall prevent SINCH from delegating the performance of any or all of its obligations under this Agreement to any Affiliate.

### 13.8 Relationship of the Parties.

The parties are independent contractors, and no partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties is created by the Agreement.

### 13.9 Rights of third parties.

Except as specifically provided for in this Agreement, this Agreement does not give rise to any third party being a third party beneficiary of this Agreement or being entitled to any rights whatsoever, including, but not limited to, the right to enforce any term of this Agreement. Under this Agreement, any liability, loss or damage incurred or suffered by an Affiliate of SINCH in relation to the supply of the Service to, or use by, Customer pursuant to this Agreement shall be deemed to constitute a liability, loss or damage incurred or suffered by SINCH.

### 13.10 Force Majeure.

Any delay in performance (other than for the payment of amounts due) caused by conditions beyond the reasonable control of the performing party is not a breach of the Agreement. The time for performance will be extended for a period equal to the duration of the conditions preventing performance.

### 13.11 Anti-Corruption

CONFIDENTIAL
08 August 2023 4:01:57 PM

DocuSign Envelope ID: 413499AB-581A-4591-A15F-C399F60478A5

The Parties, in addition to acting according to this Agreement, will comply with all Anticorruption and Bribery applicable legislation. Neither party nor its officers, directors, employees, agents, affiliates, delegates or representatives shall pay, offer or promise to pay or authorize the payment, directly or indirectly, of any money, gift, or any other type of favoring to an official or employee of a private organization or company, the government or a state agency, an agency or company which majority partner is a state body, a public organization, a candidate for public office or a political party,  a member of a political party, any person acting in an official governmental capacity and any person or entity acting for or for the benefit of any of the parties mentioned in this paragraph, for the purpose of influencing any action or decision, whether to obtain a commercial advantage or to obtain or retain business, or to direct transactions for any person. The Parties further agree to maintain books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions undertaken and the disposition of assets; and will maintain, and provide to the other Party on request, information that is reasonably required to verify compliance with this paragraph.

## 13.12 Export Regulations

Customer acknowledges that the products delivered by SINCH under this Agreement may be controlled under applicable export and import control or sanctions laws and regulations and Customer may require an export or import license from a government authority to export, transfer or import any Hardware, Software or Documentation. Customer represents that it is not on any sanction lists such as the EU restrictive list or the U.S. Treasury Department list of Specially Designated Nationals and Blocked Persons and warrants it will only use the products for civil and peaceful use and not use the products to develop or produce conventional weapons and/or nuclear, chemical, biological weapons or missiles. Nothing in this agreement shall be read as requiring either Party to be directly or indirectly involved in export, re-export, transfer, use of goods, technology, software, or services that is prohibited by applicable export control or sanctions laws

## 13.13 Governing Law.

If the Customer is located in:

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

DocuSign Envelope ID: 413499AB-581A-4531-A15F-C399F60478A5

(a) Argentina, the Agreement is governed by the laws of Republic Argentina and the Parties chose the court of Buenos Aires, to resolve the questions or controversies arising from the Agreement, excluding any other, as privileged as it may be;

(b) Australia, the Agreement and any claims relating to its subject matter will be governed by and construed under the laws of New South Wales, without reference to its conflicts of law principles. All disputes will be subject to the exclusive jurisdiction of the New South Wales courts;

(c) Belgium, the Agreement will be governed by, and construed in accordance with, the laws of Belgium, without reference to its conflicts of laws principles. All disputes will be subject to the exclusive jurisdiction of the courts in Brussels, Belgium;

(d) Brazil, the Agreement will be governed by, and construed in accordance with, the laws of the Federative Republic of Brazil. All disputes will be subject to the exclusive jurisdiction of the Central District located in São Paulo, State of São Paulo;

(e) Canada, the Agreement will be governed by, and construed in accordance with, the provincial laws of Quebec and the federal laws of Canada as applicable therein, without reference to its conflicts of laws principles.  All disputes will be subject to the exclusive jurisdiction of the provincial and federal courts in the judicial district of Montreal, Quebec;

(f) Chile, the Agreement is governed by the laws of Republic of Chile and the Parties chose the court of Santiago, to resolve the questions or controversies arising from the Agreement, excluding any other, as privileged as it may be;

(g) Colombia, the Agreement is governed by the laws of Republic of Colombia and the Parties chose the court of Bogota, to resolve the questions or controversies arising from the Agreement, excluding any other, as privileged as it may be;

(h) Ecuador, the Agreement is governed by the laws of Republic of Ecuador and the Parties chose the court of Quito, to resolve the questions or controversies arising from the Agreement, excluding any other, as privileged as it may be;

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000079

(i) Finland, the Agreement will be governed by, and construed in accordance with, the laws of Finland, without reference to its conflicts of laws principles. All disputes will be subject to the exclusive jurisdiction of the courts in Helsinki, Finland;

(j) Germany, the Agreement will be governed by, and construed in accordance with, the laws of Germany, without reference to its conflicts of laws principles. All disputes will be subject to the exclusive jurisdiction of the courts in Berlin, Germany;

(k) India, the Agreement will be governed by, and construed in accordance with, the laws of India, without reference to its conflicts of laws principles. All disputes will be subject to the exclusive jurisdiction of the courts in New Delhi, India;

(l) Mexico, the Agreement is governed by Mexican laws applicable in Mexico City and the Parties chose the court of Mexico City, to resolve the questions or controversies arising from the Agreement, excluding any other, as privileged as it may be;

(m) Peru, the Agreement is governed by the laws of Republic of Peru and the Parties chose the court of Lima, to resolve the questions or controversies arising from the Agreement, excluding any other, as privileged as it may be;

(n) Singapore; this Agreement and any matters relating to this Agreement shall be governed by and construed in accordance with the laws of Singapore, without reference to its conflicts of law principles. All disputes will be subject to the exclusive jurisdiction of the Singapore courts. A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act, Chapter 53B of Singapore to enforce any term of this Agreement;

(o) Sweden, the Agreement will be governed by, and construed in accordance with, the laws of Sweden, without reference to its conflicts of laws principles. All disputes will be subject to the exclusive jurisdiction of the courts in Stockholm, Sweden;

(p) UK, the Agreement will be governed by, and construed in accordance with, the laws of England and Wales, without reference to its conflicts of law principles. All disputes will be subject to the exclusive jurisdiction of the courts located in London, England;

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

(q) Uruguay, the Agreement is governed by the laws of Uruguay and the Parties chose the court of Montevideo, to resolve the questions or controversies arising from the Agreement, excluding any other, as privileged as it may be; or

(r) USA, the Agreement will be governed by, and construed in accordance with, the laws of the state of Georgia, USA, without reference to its conflicts of law principles. All disputes will be subject to the exclusive jurisdiction of the courts located in Georgia, USA.

The United Nations Convention on Contracts for the International Sale of Goods and the Uniform Computer Information Transactions Act (where enacted) will not apply to the Agreement. Either party must initiate a cause of action for any claim(s) relating to the Agreement and its subject matter within one (1) year from the date when the party knew, or should have known after reasonable investigation, of the facts giving rise to the claim(s). SINCH may however bring enforcement proceedings and enforce payment obligations against the Customer in any jurisdiction.

## 13.14 Entire Agreement.

The Agreement constitutes the complete and exclusive statement of the agreement between SINCH and Customer relating to the subject matter of the Agreement and supersedes all prior agreements, arrangements and understandings between the parties relating to that subject matter. Each party acknowledges that in entering into the Agreement it has not relied on any representation, discussion, collateral contract or other assurance except those expressly set out in the Agreement. Each party waives all rights and remedies which, but for this section, might otherwise be available to it in respect of any such representation, discussion, collateral contract or other assurance. Except as permitted under Section 3.3, this Agreement may be modified only in writing signed by both parties. The Agreement shall prevail over any additional, conflicting, or inconsistent terms and conditions which may appear on any purchase order furnished by one party to the other, and any additional terms and conditions in any such purchase order shall have no force and effect, notwithstanding the non-furnishing party's acceptance or execution of such purchase order.

Glossary

CONFIDENTIAL
08 August 2023 4:01:57 PM

DocuSign Envelope ID: 4134994B-581A-4591-A15F-C399F60478A5

1.1 "**Affiliate**" means SINCH or any legal entity in which Customer or SINCH, directly or indirectly, holds more than fifty percent (50%) of the entity's shares or voting rights. Any legal entity will be considered an Affiliate as long as that interest is maintained.

1.2 "**Agreement**" means an Order Form and documents incorporated into an Order Form.

1.3 "**Confidential Information**" means

   (a) with respect to Customer: (i) Customer marketing and business requirements, (ii) Customer implementation plans, and/or (iii) Customer financial information, and

   (b) with respect to SINCH: (i) the Service, Documentation, and (ii) information regarding SINCH research and development, product offerings, pricing and availability.

   (c) Confidential Information of either SINCH or Customer also includes information which the disclosing party protects against unrestricted disclosure to others that (i) the disclosing party or its representatives designates as confidential in writing at the time of disclosure, or (ii) should reasonably be understood to be confidential given the nature of the information and the circumstances surrounding its disclosure.

   (d) Confidential Information does not include Customer Data which will be subject to SINCH's obligations in Section 3.3 of the GTC.

1.4 "**Customer Data**" means any content, messages, data and/or information that Customer delivers or uploads to the SINCH Network or to a Service or provides via a Service. Customer Data and its derivatives will not include SINCH's Confidential Information nor any usage data that arises or SINCH generates in the supply of the Service.

1.5 "**Data Controller**" means given to it in the GDPR.

1.6 "**Data Processor**" means given to it in the GDPR.

1.7 "**Data Processing Agreement**" is the Data Processing Agreement ("**DPA**") applicable on the Services, and of which the most recent version can be found at https://www.sinch.com/data-protection-agreement/.

CONFIDENTIAL
08 August 2023 4:01:57 PM

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

1.8 "**Data Protection Law**" means the relevant laws and other regulations applicable to the collection, use, storage, disclosure or otherwise processing personal data (such as but not limited to and as far as applicable the General Data Protection Regulation or the "**GDPR**"), the California Privacy Rights Act (the "**CPRA**") and California Consumer Privacy Act (the "**CCPA**") and as further defined within the DPA.

1.9 "**Documentation**" means SINCH's then-current technical and functional documentation as well as any service descriptions and roles and responsibilities descriptions, if applicable, for the Service which is made available to Customer with the Service.

1.10 "**Excluded Event(s)**" means any of the following: (i) a fault in, or any other problem associated with, systems not operated or managed by SINCH; (iii) any breach of the Agreement by the Customer or a third-party within the Customer's direct control or any third party supplier to the Customer;(iv) any act by the Customer which interferes with or impedes the supply and support of the Service; (v) any suspension of the Service in accordance with the terms of the Agreement; or (vi) any other circumstances caused by events for which SINCH is not liable in accordance with the terms of the Agreement.

1.11 "**General Data Protection Regulation**" or "**GDPR**" the General Data Protection Regulation (EU) 2016/679 of the European Parliament and the Council, as amended, supplemented and/or varied from time to time.

1.12 "**Indemnity**" means any section within an Order Form, Supplement or GTC identified as an indemnity either by its wording or its heading.

1.13 "**Intellectual Property Rights**" means copyrights, database rights, patents, patent applications, patent rights, trademarks, trademark applications, trademark registrations, trademark rights, trade secrets, rights in know-how and all other intellectual property and proprietary information rights as may exist now or hereafter come into existence under the laws of any country and all pending applications for and right to apply for or register the same (present, future and contingent, and including all renewals, extensions, revivals and all accrued rights of action).

1.14 "**Order Form**" means the ordering document for a Service that references the GTC.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

1.15 **"Personal Data"** information about an individual that is defined as "personal data" or "personal information" as defined within the DPA and, if necessary, further defined within in the applicable Data Protection Law, such as but not limited to the GDPR

1.16 **"Service"** means any distinct service or services that SINCH provides pursuant to an Order Form including any support associated with such service or services.

1.17 **"SINCH Network"** means the digital networks (wireless or otherwise), server(s), hardware, software and/or any other equipment that SINCH owns, operates or leases, in its sole discretion, in connection with the supply of the Service and including any extranet access provided by SINCH in connection with the supply of the Service.

1.18 **"Supplement"** means the Supplemental Terms and Conditions that apply to the Service and that are incorporated in an Order Form.

1.19 **"Term"** means the term identified in the applicable Order Form, including all renewals.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000084

DocuSign Envelope ID: 413499AB-581A-4591-A15F-C399F60478A5

**ATTACHMENT D**

# MESSAGING SERVICE LEVEL AGREEMENT (SLA)

Version 6 - Date of release: 7 July 2023

This Service Level Agreement ("**SLA**") is part of an agreement for certain SINCH services ("**Agreement**") between SINCH and Customer and apply solely to the Services and not any other SINCH product or service.

Capitalized terms are defined in the Glossary below. Capitalized terms not defined in this SLA shall have the meanings ascribed to them in the General Terms and Conditions for SINCH Services ("**GTC**").

## General

Sinch will make the Service available to Customer as specified in the Order Form and the Agreement and in accordance with the service level as described in this SLA.

## Service Availability

Sinch will use reasonable endeavors that the Service will be available 99.95% of the time, in the manner, and with the exceptions, set forth below.

Availability of the Service will be calculated each month, as a percentage based on the fraction below:

Measurement Period – Unavailability

_____

Measurement Period

## Service Windows

**Page 59 of 65**

CONFIDENTIAL
08 August 2023 4:01:57 PM

ADOBE_PIET_000085

DocuSign Envelope ID: 4134994B-581A-4581-A15F-C399F60478A5

Notifications about scheduled service windows (excluding unplanned/emergency maintenance) will be sent no less than 10 business days in advance. The standard service windows are:

US Sites: Tuesday & Thursday 1AM – 4AM PST/PDT

Other sites: Tuesday & Thursday 9PM – 12AM CET/CEST

Service windows may be extended or shortened as needed and may fall on different times or days as needed.

## SMS Latency

SMS Content delivery latency varies between destinations and depends on the handset status. Sinch will promptly acknowledge receipt of Content upon actual receipt. Sinch measures latency across all traffic per month sent to valid and available handsets. Increased latency due to reasons outside Sinch control, such as Service Provider outages are excluded.

| Latency Type | Sinch Target Performance |
| --- | --- |
| Internal Latency | Less than 10 seconds for 90% of traffic per month |
| Handset Latency | Less than 30 seconds for 90% of traffic per month |

## Helpdesk and Fault Reporting

The Help Desk is available 24/7.

Customer may contact Sinch's Help Desk via email at support@sinch.com telephone to +1 408 617 3700 x1 (Americas customers), +65 6248 5915 (APAC Customers) or +44 20 8432 1248 (EMEA customers) to report faults, in accordance with the Fault Reporting Method set out in Section 7.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000086

DocuSign Envelope ID: 413499AB-581A-4591-A15E-C399E60478A5

Fault reports should include:

- Nature of the fault
- Priority level in accordance with this SLA. Sinch may reclassify the priority during the fault investigation.
- Sample numbers, CDRs or other data if applicable
- Time of fault

## Priority Levels

| Priority | Definition |
|---|---|
| P1 | Total loss of Service, whereby the Customer is unable to send, unable to receive or unable to send to or receive from all Service Providers networks. |
| P2 | Partial loss of Service, whereby there is an inability to send or receive from specific Service Provider's numbers or multiple networks. |
| P3 | The Service is degraded such that any agreed levels of throughput and/or latency are not met, Contents are not delivered in accordance with the relevant Order Form, or a P1 failure occurs with respect to one Service Provider's network only |
| P4 | Non-current or intermittent faults.  Where relevant, includes follow-up on P1 or P2 level faults that are no longer current.  Failures other than P1, P2 or P3 faults and any general questions or requests |

## Fault Response

Sinch shall utilize commercially reasonable efforts to deliver minimum 90% of below-mentioned fault response performance services in accordance with the following times and accuracy targets.

| Stage \ Priority | P1 | P2 | P3 | P4 |
|---|---|---|---|---|

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000087

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

| Initial Response Time | 30 minutes | 1 hour | 24 hours | 48 hours |
| --- | --- | --- | --- | --- |
| Target Restoration (work around) | 2 hours | 4 hours | 2 working days | 7 working days |
| Target Resolution | 5 working days | 10 working days | 15 working days | 30 working days |
| Progress Reports | Every 60 minutes until restoration and at resolution | Every 4 hours until restoration and at resolution | At resolution | At resolution |
| Fault Reporting Method | Email and Phone | Email and Phone | Email | Email |

## Contacts

| Level of Contact | Contact Details Sinch | Contact Details Customer |
| --- | --- | --- |
| **Level 1** <br> NOC. Technical staff on duty | **NOC Staff (24/7)** <br><br> Phone Americas: +1 4703008394 <br><br> Phone APAC: +65 31583155 <br><br> Phone EMEA: +46 844682803 <br><br> Email: support@sinch.com | **NOC Staff** <br> tel/mob: <br> email: |
| **Level 2** <br> Account Manager | **[Account Manager]** <br> Phone: (business hours) | **Name** <br> Title |

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000088

| | Email: | tel/mob: |
| | | email: |
| **Level 3**<br><br>Manager, Fault Management | **NOC Duty Manager**<br><br>Phone Americas: +1 954 678 4831<br><br>Phone EMEA: +44 203 744 8145 | **Name**<br><br>Title<br><br>tel/mob:<br><br>email: |

## Glossary

1.1 "**Availability**" means the percentage of the "Measurement Period" during which the Sinch "Service(s)" is made available to the Customer.

1.2 "**Delivery Receipt Latency**" means the time from Sinch's acknowledgement of Content reception, until Content delivery receipt is received by Sinch from relevant Service Provider. No latency target will be given for Delivery Receipt Latency since Service Provider can deprioritize Content delivery receipts.

1.3 "**Exclusion(s)**" means unavailability of the Service for one or more of the following reasons:

- Any scheduled maintenance for which Sinch gives prior notice.

- Failure of, or congestion experienced in any part of a network outside of where the Service are hosted (e.g. Service Providers or internet);

- Causes beyond any party's reasonable control as referred to in the Agreement;

- Suspension of the Services in accordance with the Agreement;

- Customer caused issues including (but not limited to):
  - Any failure to provide information requested by Sinch.

  - Any failure to interface to the Service in accordance with Sinch instructions.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

DocuSign Envelope ID: 413499AB-581A-4581-A15F-C399F60478A5

Reference Agreement Number: 00914786
Adobe Contract Number: 00941422

1.4 "**Fault Reporting Method**" means the way faults must be reported in order for Sinch to appropriately investigate the fault.

1.5 "**Handset Latency**" means the time from Sinch's acknowledgement of Content reception, until Content is delivered to relevant handset.

1.6 "**Initial Response Time**" means the target time to respond to Customer's notification to Sinch of a fault.

1.7 "**Internal Latency**" means the time from Sinch's acknowledgement of Content reception, until processed by Sinch and Content reception acknowledged by relevant Service Provider for onward delivery to handset.

1.8 "**Measurement Period**" means one (1) calendar month starting from the first day of that specific calendar month (UTC). The time is calculated in minutes.

1.9 "**Progress Reports**" means recurring updates on the fault until restoration or resolution, as applicable.

1.10 "**Service**" means for the purpose of this SLA, the SMS, MMS, Voice, Verification API services and In-app Voice and Video based services ordered by the Customer under an Order Form.

1.11 "**Target Resolution**" means the target time from when Customer has reported the fault until resolution of the fault.

1.12 "**Target Restoration**" (Work around) means the target time to find a temporary workaround for the reported fault. A temporary workaround is a solution, which substantially restores regular Service, although some non-material problems may persist.

1.13 "**Unavailability**" means a minimum continuous 5-minute periods that the Sinch "Service(s)" is not responding adequately to incoming requests, and/or are not establishing outgoing connections per region as intended, in each case expressed in number of minutes.

CONFIDENTIAL
08 August 2023 4:01:57 PM

CONFIDENTIAL

ADOBE_PIET_000090

Page **65** of **65**

**DocuSign**

| Certificate Of Completion | | |
|---|---|---|

Envelope Id: 4134994BE81A4581A15FC399E60478A5                    Status: Completed
Subject: Contract Signature
Source Envelope:
Document Pages: 65                    Signatures: 1                    Envelope Originator:
Certificate Pages: 2                    Initials: 0                    Shamah Howell
AutoNav: Enabled                    Stamps: 1                    290 Davidson Ave
EnvelopeId Stamping: Enabled                                        Somerset, NJ  08873
Time Zone: (UTC-08:00) Pacific Time (US &                                        shamah.howell@veyerlogistics.com
Canada)                                        IP Address: 147.154.25.18

| Record Tracking | | |
|---|---|---|

Status: Original                    Holder: Shamah Howell                    Location: DocuSign
         8/9/2023 9:40:34 AM                    shamah.howell@veyerlogistics.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Everton Bailey<br>Everton.Bailey@theodpcorp.com<br>Security Level: Email, Account Authentication<br>(None) | ŌDP<br>LEGAL<br>EAB<br><br>Using IP Address: 205.157.110.8 | Sent: 8/9/2023 9:44:32 AM<br>Viewed: 8/9/2023 9:45:51 AM<br>Signed: 8/9/2023 9:46:25 AM |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Kevin Moffitt<br>Kevin.Moffitt@officedepot.com<br>EVP, Chief Retail Officer<br>Office Depot<br>Security Level: Email, Account Authentication<br>(None) | _Kevin Moffitt_<br>—1291EBF75A8D444...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 108.87.54.169<br>Signed using mobile | Sent: 8/9/2023 9:46:27 AM<br>Resent: 8/10/2023 8:03:08 AM<br>Viewed: 8/10/2023 10:28:42 AM<br>Signed: 8/10/2023 10:29:40 AM |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Jay Mitchell<br>jmitchell@adobe.com<br>Security Level: Email, Account Authentication<br>(None) | **COPIED** | Sent: 8/10/2023 10:29:42 AM<br>Viewed: 8/10/2023 10:30:07 AM |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

CONFIDENTIAL

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/9/2023 9:44:32 AM |
| Certified Delivered | Security Checked | 8/10/2023 10:28:42 AM |
| Signing Complete | Security Checked | 8/10/2023 10:29:40 AM |
| Completed | Security Checked | 8/10/2023 10:29:42 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

ADOBE_PIET_000093